(239 P.3d 1290)
No. 102,741

STATE OF KANSAS, *Appellee*, v. RICHARD A. BARRIGER, *Appellant*.

Opinion filed October 1, 2010.

*Michael S. Holland II*, of Holland and Holland, of Russell, for appellant.

*Gaten T. Wood*, assistant county attorney, and *Steve Six*, attorney general, for appellee.

BEFORE STANDRIDGE, P.J., MARQUARDT and LEBEN, JJ.

LEBEN, J.: Highway Patrol Trooper Mitch Clark found Richard Barriger's truck parked partially blocking traffic on a state highway at night with Barriger relieving himself by the side of the truck. Clark stopped and found that Barriger had bloodshot, watery eyes, smelled of alcohol, admitted to drinking earlier that night, and had trouble locating his driver's license in his wallet. Because this two-lane highway had no paved shoulders, was poorly lit, and the truck had stopped near an intersection and a curve, Clark took Barriger 1 mile down the road to a parking lot to conduct standard field-sobriety tests. Based on those tests, Clark determined that Barriger had been driving while intoxicated and arrested him. A test then showed Barriger's blood-alcohol level as .15, over the legal limit of .08. Barriger was convicted of driving under the influence of alcohol; it was his third DUI offense.

Barriger appeals his conviction based on the claim that taking him away from the scene to do the field-sobriety tests converted his detention into an arrest, one that was not yet justified. We find nothing improper about taking him to a nearby parking lot when it would clearly have been unsafe to proceed at the original location.

Before we consider more of the facts of Barriger's encounter with Trooper Clark, let's provide the legal context of why any of this might matter. All of us are protected by the Fourth Amendment from unreasonable searches and seizures, and court decisions about what's reasonable in various situations guide what the police may do. Police may stop and detain us briefly on the roadways based on reasonable suspicion, meaning an objective and specific basis for believing that the person being detained is involved in criminal activity. See *State v. Pollman*, 286 Kan. 881, Syl. ¶¶ 3-5, 190 P.3d 234 (2008). But to arrest a person, the officer must meet a higher standard: probable cause, which exists when a person of reasonable caution could conclude from the known facts that an offense has been or is being committed. *State v. Fewell*, 286 Kan. 370, Syl. ¶ 4, 184 P.3d 903 (2008); see *Pollman*, 286 Kan. 881, Syl. ¶ 6.

No facts are disputed. Trooper Clark came across Barriger urinating on the roadway outside his pickup truck at about 11:20 p.m. the night after Christmas. The truck was parked partially on K-61 highway about where that highway intersects Northeast 20th Street in Pratt. According to Clark's testimony, there are no paved shoulders, the pickup was near the intersection, it's on a curve, and there's a train track next to the highway. When Clark pulled his patrol car behind the pickup, Barriger went into the pickup and turned it off. Clark approached and was greeted by the smell of alcohol. He noticed that Barriger's eyes were bloodshot and watery and that Barriger's pants were unzipped and wet in the crotch area. When Clark asked Barriger for his license, Barriger fumbled in his wallet, initially passing over the driver's license, before he located it and handed it to Clark.

From these observations, Clark suspected that Barriger had been driving under the influence of alcohol. Clark explained that because the pickup was on the roadway, Clark wanted permission to move it off the roadway. Clark also said he'd like to take Barriger to a nearby location to conduct field-sobriety tests to see whether Barriger could safely drive away. Barriger agreed to these requests. Clark parked the pickup off the roadway surface and took Barriger to the parking lot of Pratt Community College, about a mile away.

In Clark's judgment, Barriger showed several indicators of impairment in the field-sobriety tests. Clark concluded them by administering a preliminary breath test with a portable breath-test unit; it too indicated impairment. Clark then arrested Barriger at 11:46 p.m. Clark then gave Barriger the required advisories about further testing. Barriger agreed to a blood test, which was drawn at the local hospital.

Because there are no disputed facts, we judge the reasonableness of the officer's actions independently, without any required deference to the district court, which upheld the officer's actions. See *State v. Hill*, 281 Kan. 136, Syl. ¶ 2, 130 P.3d 1 (2006). The entire encounter took 26 minutes from the trooper's arrival until the officer formally arrested Barriger after the field-sobriety tests.

Barriger contends that the officer didn't have probable cause to arrest him before the field-sobriety tests were conducted. He concedes that the officer could properly investigate and ask him questions at the scene where his truck had initially stopped, but he contends that the officer arrested him—without probable cause—when he took him 1 mile away to do further investigation. Because the arrest was illegal, Barriger argues, all evidence obtained after that, including his blood-test result, must be thrown out.

Courts elsewhere have faced this general question frequently enough that Professor Wayne LaFave has concluded that "it seems clear that some movement of the suspect in the general vicinity of the stop is permissible without converting what would otherwise be a temporary seizure into an arrest." 4 LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 9.2(g), at 348 (4th ed. 2004). For example, the United States Court of Appeals for the Tenth Circuit upheld the movement of a person suspected of drug trafficking 8 or 9 miles down the road to facilitate having a drug dog sniff the exterior of the suspect's rented car. *United States v. White*, 584 F.3d 935, 952-56 (10th Cir. 2009). In *White*, rather than holding the suspect at the scene, the officer had him follow the patrol car down the road to a parking lot next to a state transportation department field office where an officer with a drug dog coming from the other direction could meet them. The field office was in the same direction the suspect had been travelling, going

there shortened the time needed to have a drug dog sniff the car, and other cases have held that a suspect may be detained for some time to await the arrival of a drug dog when there's reasonable suspicion of drugs in the vehicle. Thus, the court held that the investigatory detention was not converted into an arrest, even though the suspect was moved 8 or 9 miles at the officer's request. 584 F.3d at 954-56.

The *White* case differs from Barriger's in that the suspect in *White* was moved to expedite the investigation, while Barriger was moved for safety reasons. But that's a reason the United States Supreme Court has explicitly said is a valid one: "[T]here are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention." *Florida v. Royer*, 460 U.S. 491, 504, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983) (plurality opinion). In a case quite similar to Barriger's, the United States Court of Appeals for the Sixth Circuit held that moving a suspect from alongside a freeway to a location under the freeway overpass during heavy rain did not convert an investigatory detention into an arrest. *United States v. Pino*, 855 F.2d 357, 361-63 (6th Cir. 1988). The trial court in *Pino* concluded that the move to the underpass was necessary to shield the officer and the suspect from the heavy rain and to promote the safety of vehicles passing by on the interstate. The Sixth Circuit agreed, concluding that the move was appropriate because it was no more intrusive than reasonably necessary, did not result in a more institutional setting that could have led the suspect to feel that he was under arrest, and did not so lengthen the detention as to become unnecessarily intrusive. 855 F.2d at 362.

Because the Fourth Amendment prohibits unreasonable searches and seizures, the central question in all Fourth Amendment cases is what is reasonable. *Michigan v. Fisher*, 558 U.S. 45, 47, 175 L. Ed. 2d 410, 130 S. Ct. 546 (2009); *State v. Smith*, 286 Kan. 402, 407, 184 P.3d 890 (2008). Courts consider an investigatory detention acceptable when based only on reasonable suspicion—rather than the probable-cause standard needed for an arrest—largely because it is assumed that an investigatory detention will be relatively brief and no longer than reasonably necessary.

Thus, an investigatory detention must be temporary and last no longer than is necessary under the circumstances. *Royer*, 460 U.S. at 500; *White*, 584 F.3d at 953-54; *State v. Thompson*, 284 Kan. 763, Syl. ¶ 7, 166 P.3d 1015 (2007). Normally the scope and duration must be reasonable in relation to the reason for the investigation. *Smith*, 286 Kan. at 407. But with reasonableness as the guide and safety concerns at hand, an officer should be allowed to act reasonably to protect the safety of both the officer and the suspect while still following all other rules applied to an investigatory detention. We conclude, therefore, that when required for the safety of the officer or suspect, a suspect may be moved a short distance during an investigatory detention if that is consistent with the purposes of the investigation, does not unduly prolong the duration of the detention, and does not otherwise turn the situation into the equivalent of a formal arrest.

Barriger cites two decisions from our court in support of his argument that the investigatory detention of him transformed into an arrest when he was moved to the parking lot for field-sobriety tests. In both cases, the suspect was taken a short distance to the local police station for field-sobriety testing. See *City of Norton v. Wonderly*, 38 Kan. App. 2d 797, 800-01, 172 P.3d 1205, *rev. denied* 286 Kan. 1176 (2008); *City of Norton v. Schoenthaler*, 2007 WL 2410122 (Kan. App. 2007) (unpublished opinion), *rev. denied* February 13, 2008. In our view, each of these cases is premised on the notion that the officer had turned the situation into the equivalent of a formal arrest by the combination of all other factors joined with taking the suspect to the police station and by the overall situation. In *Wonderly*, for example, the suspect was handcuffed for the two-block trip to the station. Professor LaFave has noted that moving the suspect from another location to a police station usually converts a detention into the equivalent of an arrest, 4 LaFave, Search & Seizure § 9.2(g), at 354-55, and the *Pino* court specifically noted that the move from the rainy interstate highway to a location in the underpass was acceptable in part because it did not result in a more institutional setting and thus was "no more intrusive than the original stop on the interstate." 855 F.2d at 362. The same is true in Barriger's case—a parking lot next to an edu-

cational institution was substituted for a state highway at an intersection. The substitute location was no more intrusive yet much safer, and it was only a short distance away.

Because the ultimate test in a Fourth Amendment case is reasonableness, there usually is no single factor that is determinative. Instead, the court must consider all of the facts in the case before it. See *Thompson*, 284 Kan. 763, Syl. ¶ 20. Barriger had stopped his truck on a highway near an intersection with another road, and there was no paved shoulder on which to do field-sobriety tests. The officer's request to move to a nearby parking lot was reasonable, did not prolong the traffic stop more than was reasonably necessary, and did not otherwise turn the situation into the equivalent of a formal arrest. The trooper did not use handcuffs, draw a weapon, or force compliance in any physical way. The trooper neither searched Barriger's truck nor asked permission to do so— he focused only on a single task of determining whether Barriger could safely drive.

While the trooper did have possession of Barriger's keys and driver's license, the trooper needed the keys to safely move the truck out of the roadway, and the retention of a license by itself does not turn an investigatory detention into an arrest. After all, the significance of the retention of a license is merely that it's a factor in determining whether a person is free to leave. See *Pollman*, 286 Kan. at 889. But a person is seized (*i.e.*, is not free to leave) whether the situation is an investigatory detention or an arrest. Thus, the retention of the keys and license have little role in determining whether Barriger was merely detained for a relatively brief investigation or had been arrested. See 4 LaFave, Search & Seizure § 9.2(g), at 354.

After hearing the evidence, the district judge in this case found that the officer hadn't converted the investigatory detention into an illegal arrest, concluding that "the actions of the officer just seem to be appropriate to me." He concluded with a hypothetical situation in which the officer had been new to the job and had called the judge at home at 11:30 p.m., saying, "What do I do? I've got this guy partially blocking 61 Highway and I don't know what

to do. It's my first day on the job." The judge said he would have replied, if he had retired and were permitted to answer, "Well, get his car off the highway and make sure he's okay." We think the judge called it right—getting Barriger's truck off the highway and then conducting field-sobriety tests at a convenient, nearby parking lot was reasonable. The judgment of the district court is therefore affirmed.