No. 102,071
STATE OF KANSAS, *Appellee*, v. REX REISS, *Appellant*.
(326 P.3d 367)

Opinion filed May 2, 2014.

*Matthew J. Edge*, of Kansas Capitol Appellate Defender Office, argued the cause and was on the brief for appellant.

*Cheryl M. Pierce*, assistant county attorney, argued the cause, and *Steve Six*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

NUSS, C.J.: Rex Reiss contends the district court and Court of Appeals both erred in refusing to suppress evidence from a traffic stop that led to his conviction for driving under the influence of alcohol. Reiss asserts he was unlawfully seized, tainting the evidence and requiring its suppression.

We agree. Evidence was obtained after a seizure unsupported by reasonable suspicion. So we exclude the tainted evidence, reverse Reiss' conviction that relied upon it, and remand to the district court for further proceedings.

### FACTS AND PROCEDURAL HISTORY

At about 1 a.m. Augusta Police Officer Ricky Ritter observed a blue pickup truck traveling without its headlights on. Traveling directly behind was a red pickup truck driven by Reiss, with a van following Reiss.

Ritter pulled his squad car behind the three vehicles and activated his emergency lights, intending to stop only the blue truck. The driver of the van pulled over, and Ritter passed it. The driver

of the blue pickup and Reiss then pulled over simultaneously. Ritter stopped behind Reiss' truck because of insufficient room behind the blue pickup. He testified that even with sufficient space, he would not have parked in front of Reiss because that location would have required turning his back to an unknown driver.

As Ritter pulled over, he called his dispatcher to announce the stop. During that call and immediately after the vehicles stopped, Reiss left his truck cab and approached Ritter's squad car. Ritter described Reiss' action as "charging me." With a raised voice, Reiss repeatedly demanded that Ritter explain why he had been pulled over. Ritter then requested backup, exited his squad car, and directed Reiss to stand back. He also told Reiss to get back in his truck. Reiss' behavior worried Ritter because it was unusual for someone to exit a vehicle and approach a squad car during a traffic stop.

Reiss ignored Ritter's direction and continued to demand an explanation for what he did wrong. After Ritter repeated his direction, Reiss eventually complied.

At the suppression hearing, Ritter testified about this roadside exchange with Reiss as follows:

"Q. [Attorney for the State:] Okay. Did ultimately you meet him up close face-to-face?

"A. [Ritter:] I—he finally started backing towards his vehicle as I was walking toward him. And he got back into his truck before I walked up face-to-face with him.

"Q. [Attorney for the State:] Okay. Did you have any conversation with him at that point?

"A. [Ritter:] Yes, I did.

"Q. [Attorney for the State:] What conversation did you have? Tell us about that.

"A. [Ritter:] *I asked him why he had gotten out of his vehicle. And he told me that he just didn't really know what he did. I said that's ok.* I asked him for his driver's license and proof of insurance to identify who he was. I was talking to him, I could tell that he was—he was having trouble pronouncing his words. He was slurring and kind of mumbling. Hard to understand. And his eyes were blood-shot and kind of had a watery look to them. They were also droopy. I asked him if he had been drinking. And he said that he had, but not very much." (Emphasis added.)

Ritter then clarified the event sequence of this interaction:

"Q. [Attorney for the State:] Okay. Now you mentioned that you asked him for his license and registration—Mr. Reiss?

"A. [Ritter:] Yes.

"Q. [Attorney for the State:] Why did you ask him for those things?

"A. [Ritter:] To identify who he was. He stopped his vehicle in front of me. And got out and ran back towards me. So I—I wanted to know who I was dealing with.

"Q. [Attorney for the State:] At the time you asked him for his license and registration, had you noticed anything about his demeanor, the slurring words and so forth?

"A. [Ritter:] No. Not before then." (Emphasis added.)

As Ritter talked to Reiss, Sergeant Chris Scheuber arrived to provide backup. Ritter told Scheuber he believed Reiss was driving under the influence of alcohol (DUI). Ritter decided to investigate Reiss for DUI after observing his behavior and appearance during their exchange at the truck. But first Ritter approached the blue pickup truck while Scheuber watched Reiss. Ritter did not return Reiss' driver's license and other documentation until after he dealt with the occupants of the blue truck.

After Ritter finished with that truck, he returned his attention to Reiss. Ritter asked him to take a field sobriety test. After Reiss failed the test, Ritter arrested him for DUI. The State formally charged Reiss with felony DUI in violation of K.S.A. 2007 Supp. 8-1567.

Reiss filed a pretrial motion to suppress the DUI evidence. The district court denied the motion, noting the unique circumstances of the case and the potential for danger to Ritter. The court ruled Ritter's initial direction for Reiss to return to the truck was not a seizure.

The court further concluded Ritter acted lawfully to establish Reiss' identity. Because Ritter developed reasonable suspicion to investigate Reiss for DUI during this exchange, the court held that the later investigation, *i.e.*, his further questioning and the field sobriety test, was lawful.

After a jury convicted Reiss of DUI, the court sentenced him to 6 months in jail and imposed a fine of $2,500. A Court of Appeals

panel ultimately rejected Reiss' appeal. It first disagreed with the district court, concluding Reiss was seized without reasonable suspicion the moment he complied with Ritter's "order" to return to his truck. *State v. Reiss*, 45 Kan. App. 2d 85, 88, 244 P.3d 693 (2010).

The panel noted, however, public and officer safety concerns can justify a brief detention without reasonable suspicion. The panel analogized situations where the United States Supreme Court has held that the Fourth Amendment permits brief, suspicionless detentions.

Specifically, the panel noted that passengers in an automobile during a traffic stop and occupants of a residence being lawfully searched may both be briefly detained in the interest of officer safety without any suspicion of their criminal wrongdoing. So the panel held Ritter acted reasonably to protect himself and officer safety concerns outweighed Reiss' liberty interest. 45 Kan. App. 2d at 88-91. The panel further held that Ritter's "asking for identification in this circumstance was itself only a minimal intrusion." 45 Kan. App. 2d at 92. Accordingly, the panel affirmed the district court's denial of evidence suppression, albeit for somewhat different reasons.

We granted Reiss' petition for review, accepting jurisdiction under K.S.A. 60-2101(b). More facts will be added as necessary to the analysis.

## Analysis

Issue: *The district court erred by denying Reiss' motion to suppress evidence because Ritter eventually seized Reiss without reasonable suspicion.*

Reiss does not dispute the propriety of the initial stop. He instead contends he was seized because Ritter's ordering him to return to his truck qualified as a show of authority to which he submitted. Reiss further contends that because he was detained without reasonable suspicion of any criminal activity at any time, the seizure was unlawful. And all evidence later obtained therefore must be excluded as fruit of the poisonous tree. See *Wong Sun v.*

*United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); *State v. McGinnis*, 290 Kan. 547, 233 P.3d 246 (2010).

The State responds that during the traffic stop, Reiss displayed unusual behavior which justified Ritter's decision to direct him back to his truck for officer safety purposes. It denies Ritter's order converted this part of the encounter into an investigative detention.

The State concedes Ritter seized Reiss for an investigative detention when questioning him at his truck and asking for his driver's license and registration or proof of insurance. But the State argues this detention was constitutionally permissible because it was then supported by reasonable suspicion. It points to his physical appearance, slurred speech, and behavior as evidence. The State specifically concludes the district court properly denied Reiss' motion to suppress because Ritter did not subject him to an investigative detention until after Ritter correctly determined there was reasonable suspicion Reiss was driving under the influence of alcohol.

*Standard of Review*

Our standard of review for general motions to suppress evidence is well known:

" ' "When reviewing a motion to suppress evidence, this court reviews the factual underpinnings of a district court's decision for substantial competent evidence and the ultimate legal conclusion drawn from those facts de novo. The ultimate determination of the suppression of evidence is a legal question requiring independent appellate review. [Citation omitted.] The State bears the burden to demonstrate that a challenged search or seizure was lawful." ' [Citations omitted.]" *McGinnis*, 290 Kan. at 551.

We do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. We also accept as true all inferences to be drawn from the evidence which support or tend to support the findings of the district court. *State v. Walker*, 292 Kan. 1, 16, 251 P.3d 618 (2011) (citing *U.S.D. No. 233 v. Kansas Ass'n of American Educators*, 275 Kan. 313, 320, 64 P.3d 372 [2003]).

*Discussion*

The Fourth Amendment to the United States Constitution and Section 15 of the Kansas Constitution Bill of Rights assure each

person the right to be secure in his or her person against unreasonable seizures. See *State v. Thompson*, 284 Kan. 763, 772, 166 P.3d 1015 (2007). We have construed these two provisions to protect the same guarantees. *State v. Moralez*, 297 Kan. 397, 404, 300 P.3d 1090 (2013). To enforce the constitutional provisions, we must first determine whether a seizure occurred.

We determine whether a seizure has occurred by classifying the nature of the encounter between police and citizen. We recognize four types of encounters: consensual encounters, which are not seizures; investigative detentions, commonly known as *Terry* stops; public safety stops; and arrests. *Thompson*, 284 Kan. at 772 (citing *State v. Parker*, 282 Kan. 584, 588-89, 147 P.3d 115 [2006]); see K.S.A. 22-2402; *Terry v. Ohio*, 392 U.S. 1, 18, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

Once we have determined a seizure occurred, we must then determine whether the seizure was reasonable. Because the Fourth Amendment only forbids "unreasonable" seizures, reasonableness is the touchstone for analysis of whether a seizure is constitutionally permissible. *State v. Spagnola*, 295 Kan. 1098, 1105, 289 P.3d 68 (2012) (citing *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S. Ct. 417, 136 L. Ed. 2d 347 [1996]). And the reasonableness of a seizure is generally determined by balancing "the public interest and the individual's right to personal security free from arbitrary interference by law enforcement officers." *Thompson*, 284 Kan. at 772 (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S. Ct. 2574, 45 L. Ed. 2d 607 [1975]).

*Reiss was seized when he complied with Ritter's order and returned to his truck, but it was reasonable because of concern for officer safety.*

We set forth several considerations for determining the existence of a seizure in *McGinnis*, 290 Kan. at 552:

"The United States Supreme Court has developed a 'totality of the circumstances' test to determine if there is a seizure, or instead a consensual encounter. See *State v. Thompson*, 284 Kan. 763, 775, 166 P.3d 1015 (2007). '[U]nder the test, law enforcement interaction with a person is consensual, not a seizure if, under the totality of the circumstances, the law enforcement officer's conduct conveys to a reasonable person that he or she was free to refuse the requests or

otherwise end the encounter.' 284 Kan. at 775. Stated another way, ' "[s]o long as a reasonable person would feel free to 'disregard the police and go about his business,' [citation omitted], the encounter is consensual and no reasonable suspicion is required." ' *State v. Reason,* 263 Kan. 405, 410, 951 P.2d 538 (1997) (quoting *Florida v. Bostick,* 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 [1991]). Consequently, in *Reason* we held that only if ' " 'the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.' " ' 263 Kan. at 410-11."

The standard of appellate review for this specific subset of suppression determinations—the trial court's decision of whether the encounter is consensual or a seizure—is quite similar to the standard for general suppression of evidence:

"Appellate review of the trial court's determination of whether a reasonable person would feel free to refuse the officer's requests or otherwise terminate the encounter consists of two parts: (1) the factual underpinnings are reviewed under a substantial competent evidence standard and (2) the ultimate legal conclusion drawn from those facts, *i.e.*, whether a reasonable person would feel free to refuse the requests or to otherwise terminate the encounter, is reviewed under a de novo standard." *Thompson,* 284 Kan. at 776 (citing *State v. Moore,* 283 Kan. 344, 352, 154 P.3d 1 [2007]).

In applying this "totality of circumstances" test, we have identified a nonexhaustive list of factors to consider:

"In *Thompson,* we set forth a nonexclusive list of factors that frequently occur in this type of encounter to aid in our consideration of the totality of the circumstances. Those factors that tend to establish a voluntary encounter include: 'knowledge of the right to refuse, a clear communication that the driver is free to terminate the encounter or refuse to answer questions, return of the driver's license and other documents, and a physical disengagement before further questioning.' 284 Kan. at 811. Factors that tend to establish a continued detention include:

'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person, the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory, the prolonged retention of a person's personal effects such as identification, a request to accompany the officer somewhere, interaction in a nonpublic place, absence of other members of the public, or the display of emergency lights. [Citations omitted.]' *Thompson,* 284 Kan. at 811." *State v. Murphy,* 296 Kan. 490, 492-93, 293 P.3d 703 (2013).

We have cautioned that no particular factor is itself determinative in the seizure analysis:

"There is no rigid application of these factors; instead, we analyze the facts of each case independently. We have held that '[i]n applying the totality of the circumstances test in a Fourth Amendment context, no one factor is legally determinative, dispositive, or paramount. The outcome does not turn on the presence or absence of a single controlling or infallible touchstone and requires careful scrutiny of all the surrounding circumstances.' *Thompson*, 284 Kan. 763, Syl. ¶ 20. On the other hand, 'we do not expect courts to merely count the number of factors weighing on one side of the determination or the other. In the totality of the circumstances, a factor may be more indicative of a coercive atmosphere in one case than in another. [Citations omitted.]' 284 Kan. at 804." *McGinnis*, 290 Kan. at 553.

Reiss argues that a reasonable person would not have felt free to leave under the totality of the circumstances facing him. As mentioned, he primarily argues that Ritter's direction was a command, *i.e.*, a show of authority with which he complied. Indeed, although the State contends that this was not a seizure because Ritter acted reasonably, it essentially conceded at oral argument that a reasonable person in Reiss' position would not have believed Ritter's direction was merely a request or suggestion.

We agree with the panel that, under the standard articulated above, Reiss was seized the moment he complied with Ritter's direction. Under the totality of the circumstances, a reasonable person would not have felt free to refuse Ritter's direction to return to the truck or felt free to otherwise terminate the encounter, *i.e.*, drive away. See *McGinnis*, 290 Kan. at 555.

Several factors support this legal conclusion. See *Thompson*, 284 Kan. at 776. As the panel noted, Reiss returned to his truck because of Ritter's forceful command to do so. Ritter repeatedly testified that he was "yelling" when he directed that Reiss return to the truck such that Ritter considered his words an "order." See 284 Kan. at 811 (use of aggressive tone of voice indicating compliance with officer's request is compulsory). And a reasonable person in Reiss' position would have interpreted Ritter's yelled direction as mandatory. One panel of the Court of Appeals has previously held an officer's similar order was itself sufficient to qualify as a seizure. See *State v. Gross*, 39 Kan. App. 2d 788, 798-99, 184 P.3d 978 (2008) (Driver "Stroot had been detained when he was ordered to

the back of the patrol car after attempting to walk away from his car and the patrol car.").

In addition, Ritter's squad car with activated emergency lights was parked directly behind Reiss' truck. See *Thompson*, 284 Kan. at 811 (display of emergency lights is a factor). At the time of Ritter's command, Reiss clearly was under the impression he was the subject of Ritter's traffic stop, *i.e.*, demanding "why was I pulled over?" Although Reiss' subjective—and mistaken—impression is not dispositive, we conclude that a reasonable person in his position would have drawn the same conclusion. When a driver sees a squad car behind with activated emergency lights, pulls to the side of the road, and the squad car then pulls directly behind, a reasonable driver would conclude he or she is the subject of a traffic stop. And we have consistently held that a traffic stop is an investigatory detention, not a voluntary encounter. See, *e.g.*, 284 Kan. at 773.

Because we conclude that Reiss was seized, we must now consider whether that seizure was reasonable. See *Spagnola*, 295 Kan. at 1105. Although we conclude there was no reasonable suspicion of criminal wrongdoing, we agree with the district court and panel that the seizure was reasonable because of officer safety concerns.

Although Reiss was not the intended target of Ritter's traffic stop, the circumstances of this encounter were so similar to a traffic stop that we find cases analyzing seizures in that context instructive. As noted, we balance Ritter's legitimate concern for his personal safety against Reiss' right to be free from arbitrary interference by law enforcement. See *Thompson*, 284 Kan. at 772 (citing *Brignoni-Ponce*, 422 U.S. at 878).

The United States Supreme Court has described police officer safety as a "weighty interest," particularly during traffic stops. *Robinette*, 519 U.S. at 413. "[T]raffic stops are 'especially fraught with danger to police officers.' " *Arizona v. Johnson*, 555 U.S. 323, 330, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009) (quoting *Michigan v. Long*, 463 U.S. 1032, 1047, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 [1983]).

The Court has concluded this safety interest justifies warrantless searches and seizures that appear unlawful in other contexts. See,

*e.g., Brendlin v. California*, 551 U.S. 249, 255-56, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007) (recognizing that an occupant of a vehicle is lawfully seized without reasonable suspicion during a traffic stop); *Maryland v. Wilson*, 519 U.S. 408, 414-15, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997) (holding an officer may order an occupant out of a lawfully stopped automobile absent reasonable suspicion that the occupant is involved in criminal activity).

The panel correctly observed that some lower courts have concluded an officer may require a passenger who has exited a vehicle to reenter it based on the officer's need to control the traffic stop scene to keep it safe for officers and the public. 45 Kan. App. 2d at 89 (citing, *inter alia, United States v. Sanders*, 510 F.3d 788, 789-91 [8th Cir. 2007]; *United States v. Williams*, 419 F.3d 1029, 1031-34 [9th Cir. 2005]). We independently observe per the United States Supreme Court: " ' "The risk of harm to both the police and the occupants [of a stopped vehicle] is minimized . . . if the officers routinely exercise unquestioned command of the situation. [Citations omitted.]" ' " (Brackets in original.) *Arizona v. Johnson*, 555 U.S. at 330.

In addition, an officer's order that a person either exit or remain in a vehicle is a small intrusion on individual liberty. In *Wilson*, the Supreme Court reasoned that a vehicle occupant had only a slight liberty interest in not being directed out of the car by police because, "as a practical matter, the passengers [were] already stopped by virtue of the stop of the vehicle." 519 U.S. at 413-14. The Court further concluded that such orders only caused a "minimal" liberty interest intrusion because they merely changed the location of the detention. 519 U.S. at 414-15.

Ritter had a weighty interest in preserving his safety. He essentially made an unassisted traffic stop at 1 a.m. where three drivers pulled over. At least one of the vehicles—Reiss'—contained multiple occupants.

Moreover, Ritter immediately observed Reiss exit his truck and charge the squad car, an act the officer characterized as unusual and therefore worrisome. In other words, this encounter was beyond the ordinary traffic stop which is already " 'especially fraught with danger to police officers.' " See *Arizona v. Johnson*, 555 U.S.

at 330. So Ritter called for backup. And he repeatedly ordered Reiss to get back in his truck. Ritter's orders were natural and appropriate responses helping him maintain command of the scene under rapidly developing circumstances. See 555 U.S. at 330.

In addition to Ritter's weighty interest in officer safety, Reiss' liberty interest to remain outside his truck was small, if present at all. And the intrusion on his liberty was "minimal." See *Wilson*, 519 U.S. at 415. Ritter's order and Reiss' compliance merely reinstated the conditions existing before Reiss' rash decision to exit his truck. See *Sanders*, 510 F.3d at 791.

Ritter's command was an eminently reasonable measure to preserve officer safety. So his initial seizure of Reiss was permissible under the Fourth Amendment.

> *Ritter performed an investigative detention without reasonable suspicion when requesting Reiss' driver's license and vehicle registration.*

The detention for Ritter's safety was ongoing when he initially approached the reseated Reiss. Reiss had obeyed Ritter's command to return to his truck, and a reasonable person would remain there until further directed by the officer.

So Ritter was justified in his initial exchange with the seated Reiss. Ritter testified that "I asked him why he had gotten out of his vehicle. And he told me that he just didn't really know what he did. I said that's ok."

In short, Ritter had quickly resolved his safety concerns that justified Reiss' initial detention. The State did not provide evidence to suggest otherwise—except that Ritter had been unwilling to turn his back on Reiss' truck, a concern easily resolved by advising Reiss he was now free to go. See *McGinnis*, 290 Kan. at 552 (State has burden to demonstrate a challenged seizure was lawful). But then Ritter changed the thrust of the officer-citizen encounter: "I asked him for his driver's license and proof of insurance to identify who he was."

And it was only after this request for documentation that Ritter noticed anything askew:

"I was talking to him, I could tell that he was—he was having trouble pronouncing his words. He was slurring and kind of mumbling. Hard to understand. And his eyes were bloodshot and kind of had a watery look to them. They were also droopy. I asked him if he had been drinking. And he said that he had, but not very much."

The event sequence—a request for documentation, followed by notice of DUI indicators, then purported reasonable suspicion to justify the field sobriety test—was confirmed in Ritter's later testimony:

"Q. [Attorney for the State:] At the time you asked him for his license and registration, had you noticed anything about his demeanor, the slurring words and so forth?

"A. [Ritter:] *No. Not before then.*" (Emphasis added.)

In sum, once Ritter's safety concerns ended and he requested Reiss' driver's license and registration or insurance proof, he was beginning to perform an investigative detention. To be constitutionally permissible, such a detention required reasonable suspicion. See *State v. Thomas*, 291 Kan. 676, 687, 246 P.3d 678 (2011) ("Investigatory detentions are generally permitted under the Fourth Amendment to the United States Constitution and K.S.A. 22-2402 if 'an objective officer would have a reasonable and articulable suspicion that the detainee committed, is about to commit, or is committing a crime.' ").

Although the State argues Ritter possessed reasonable suspicion, its citations to the record reveal he admitted the factors supporting his suspicion did not appear until after he had requested Reiss' documentation. That is too late. The State provides no authority to suggest a valid detention for officer safety can become a legitimate investigatory detention under these particular circumstances involving this sequence of events. But see *Walker*, 292 Kan. at 15-16 (constitutionally permissible boundaries of reasonable suspicion detention not exceeded by taking pedestrian defendant's ID and using it to run a computer records check).

So while we agree with the panel that Ritter was "properly concerned about his safety," we disagree that then "asking for identification in this circumstance was itself only a minimal intrusion. [Citations omitted.]" 45 Kan. App. 2d at 92. Ritter simply was not

warranted in asking for this documentation once his justifiable concern for his safety had disappeared.

All evidence of criminal wrongdoing obtained after Reiss' unlawful seizure was therefore tainted. See *McGinnis*, 290 Kan. at 551. Accordingly, the district court and Court of Appeals erred in denying Reiss' motion to suppress. Because the evidence indicating that Reiss was driving under the influence of alcohol was tainted and should have been suppressed, we must reverse his conviction for that offense.

Judgment of the Court of Appeals affirming the district court is reversed. Judgment of the district court is reversed and remanded.